Dargan, Ch.
dissenting. — In this case I feel constrained to enter my protest against the decision of a majority of the court. I feel thus constrained by the importance of the principle therein adjudicated and the magnitude of the interests which, in all human probability,'are involved, and which will be affected and controlled by that decision. The decision in this case is understood by a majority of the Judges to be a reversal of the decisions in the Ordinary v. Geiger, (decided in 1805,) and Burgess v. Heape, (decided in 1833,) and consequently of what has been the acknowledged law of the land for at least 45 years. The principle of law therein supposed to be settled, and thus recognised by the highest tribunals of the State, has since been frequently cited, with approbation, by able and learned Judges; has been acquiesced in by the universal assent of the bench and bar, and has not till now been challenged or questioned, so far as I am informed. In the meantime, the whole justice of the country to which the principle applies, has been administered in accordance with the decisions in the cases which I have cited, and to reverse them now is to acknowledge that all the transfers of estates made by the court on this principle, have been altogether unauthorized by law. It would be difficult to conjecture the extent of the injury to the rights of parties that has resulted from the maladministration of the law in this particular, by the transfer of property to persons who, in fact, (as the law is hereafter to be understood,) had no title whatever. The amount of the illegal transfer of property by the court, as among its suiters, is doubtless vast in the last half century. Put the mischief is not limited to cases in court, for doubtless parties have, in a number of instances, adjusted their rights out of court by amicable settlements made in reference to what was understood to be the law that prevailed in court. If any one of these parties, who has been made the victim of this error, were to confront the court, and reproach it with the wrong which has been done, the reply could not be that of the conscience-stricken monarch to the ghost of the murdered Banquo, “thou canst not say I did it.’’
But the mischief does not terminate with the past. The present defendant has, I think, a just right to complain. He purchased property, under what any lawyer in South Carolina, predicating his opinion upon the decisions and practice of the court, would have pronounced a good title. And he is now, by the judgment of the court, divested of that title, on the ground that those decisions and the practice under it, were all wrong, and founded in error. He is to be told that the em *476 inent judges, who made those desisions, and those who gave tpeni tlieir approbation, and administered the justice of the 'country under them, were all under illusion; that new light pas ^urst Upon their present successors ; and that it is necessary for the court to retrace its steps back to the right path from which it has so long wandered, at whatever cost and sacrifice it may be to those citizens who have acted upon the opinions and decisions of the court.
The interests of the defendant, as involved in this question, are, however, insignificant, compared with those of that large class whose titles will be disturbed, weakened, and destroyed by the promulgation of this decision. This is destined to be but the first of a series of cases on this subject. A great deal of property, within the limits of the State, must change hands or ownership; property that has been bought, bona fide, under the principles supposed, not without good reason, to be settled by the decisions of the court.
In the preceding remarks, I have endeavored to depict some of the mischiefs that must necessarily grow from the reversal of a principle of law which has long operated as a rule oí property. They are mischiefs with which a court should not suffer itself to be reproached, except upon grounds of strong necessity. The decisions of courts necessarily have, unlike legislative acts, a retro-active operation. Legislation that is intended to have a retrospective bearing and effect upon the rights and interests of the citizen, would not be tolerated for a moment. But a revolution in these principles, which have lor a half century prevailed in the court, as rules of property, is equally pernicious and objectionable. And if theie be a necessity for a change, it should be left to the legislative department of the government to apply the remedy. These remarks willnot be considered otherwise than pertinent, because a majority of the court, as I have already said, consider the decision in this case as overruling and reversing that of the Ordinary v. Geiger.
I will now address myself strictly to the questions at issue before the court.. Peter Sinltler, by his last will and testament, bequeathed the negroes in controversy, to his sister, Mrs. Jane Glover, for life, and after her death, by a limitation, which has been decided by the Court of Appeals in the last resort to be valid, he gave the said negroes to the issue of her body, to them, their heirs and assigns forever. Mrs. Glover, who supposed the negroes to belong to her absolutely, bequeathed them to her son, Dr. Glover. He, after her death, held and claimed them in his own right, until the decision which has been referred to in Lemacks v. Glover, by which all the issue of Mrs. Glover were held to be entitled to take under the limitation as purchasers. By this decree, Mrs. Hyrne, wife of the complainant, was entitled, with Dr. Glover *477 and others, to a part of the estate. Mrs. Glover died previous to February, 1843, when the bill was filed for a partition. Mrs. Hyrne died in August, 1843, and in December of'' the same year, Henry Hyrne, her husband, sold his share of the individual estate to the defendant, Simon Verdier. There was a decree, as to the rights of the parties, under the will of Peter Sinkler, previous to the death of Mrs. Hyrne, but partition was not made of the estate until the year 1845, when the negroes, which are the subject matter -of this suit, were allotted and set apart as the share of Mrs. Hyrne in the common estate. They were placed in possession of the defendant, who, fro hac vice, had become the administrator of his wife. And this is an action of trover brought by Verdier against him, to recover the negroes under the sale before mentioned. If Hyrne’s marital rights had attached upon the estate of his wife, in the negroes, at the time of the sale to Verdier, he is entitled to recover.
1 think that a great deal of the difficulty with which the case has been supposed to be environed, has originated from the fact that endue importance has been attached' to the decree in Lemacks v. Glover, as affecting the rights of Hyrne to his wife’s estate. Her rights were pre-existent to and independent of that decree, and were derived under the will of Peter Sinkler, by which she took as the purchaser of a legal estate, in common with others. The decree was merely a judicial recognition of those rights against one claiming adversely. The decree gave her nothing which she did not before possess, except a separation of her rights from those of her co-tenants, which was effected by the subsequent partition.— If A executes a title ftir a negro to B, which negro comes into the possession of C, and B brings trover against 0 for the negro, and recovers, B derives no title under the judgment.— This only settles á controversy between him and an adverse claimant, and his title is to be referred to his bill-of sale.— Thus, in this case, in determining the question as to the marital rights of Hyrne, we are to leave out of view the decree and all the proceedings in Lemacks v. Glover, as if they had no existence.
And further to disembarrass 'the case of all extraneous matter, we are to consider the fact, that there was a precedent life estate in Mrs. Glover, as not at all pertinent to the issue. She, according to the most familiar, principles, had received the estate for herself for life, and for the remainder men who were to come after her. When the executor of Peter Sinkler assented to and delivered the legacy to Mrs. Glover, his assent and delivery was as well for the remainder men as for the life tenant. No new assent and delivery was necessary to vest their rights. The life estate had expired at the time of the sale to Verdier. And on the death of Mrs. Glover, *478 the legal estate vested in Mrs. Hyrne and her co-tenants by operation of law. And no further act was necessary to be "done, to cause it to vest. One of the co-tenants, (Dr. Glover) had actual possession of the negroes, which by a very plain principle of law applicable to common estates, was equally the possession of his co-tenants as of himself.
I have already said that the law on this subject is settled, and I am well warranted in this opinion, if the most solemn decisions and a long acquiessence and practice under them, can be considered as having that effect. The case, when stripped of the extraneous circumstances which attend it, and which have a tendency to mislead, presents the most perfect parallel to that of the Ordinary v. Geiger. Between them the most powerful analysis cannot detect a real difference, nor the most ingenious sophistry a plausible one. In Ordinary v. Geiger, as in this case, there was a tenancy in common, which was vested as to the right of possession. The negroes were fourteen in number, of which the husband only had possession of one. The others were in the possession of one of the co-tenants. It was solemnly decided that the marital rights attached to the wife’s undivided fourth of the entire estate, on the broad principle that the possession of one co-tenant was the possession of the whole, and that was a sufficieut possession for the marital rights to attach upon. There was no pre-tence of there having been a partition, nor was there stress laid on the fact that the husband had one of the negroes in possession, as his rights were not confined to that one, but were held to extend to an undivided fourth part of the whole, on the possession of his co-tenants. It is worthy of remark, that this case was decided unanimously by an able bench, and without hearing argument in favor of the marital rights; facts that tend to show that the principle on which the case was decided was considered as well understood and settled at that period, and that the doctrine had prevailed farther back in the past than the date of the decision. The case also possessed another strong feature, to wit: that the marital rights were held to have attached against the claim of the wife who survived.
The next leading case to which I will refer, is that of Burgess v. Heape, decided expressly upon the authority of the Ordinary v. Geiger, and in which the doctrine settled in the latter, obtained the unqualified approbation of the Court of Equity. In the case cited from Hill, there are the identical leading legal features that belong to the case now under judgment. The defendant, Burgess, and his sister, Eliza, had recovered the negroes by a decree of the Court of Equity. Pending the suit in which the recovery was had, Eliza Heape married Robert S. Burgess, the complainant. After a decree in their favour, and during the life of Mrs. Burgess, *479 the defendant took possession of the slaves, and removed with them out of the State, and refused partition. Being found in the State, he rvas sued, and a ne exeat issued'' against him. Mrs. Burgess was dead previous to the commencement of the suit, and there was no administration on her estate. So that if the survivor’s husband was entitled to recover, it was upon the strength of his marital rights. By the decree of the Court, he was held entitled to recover one-half of the negroes, (although Mrs. Burgess had left a child, who was also a party before the Court.) The decision was predicated upon the principle, (and that alone) that Heape and his sister were joint tenants, and Heape being in possession, his possession was that of his co-tenant, and, therefore, the marital rights attached. This case possesses no contradistinctive features from the case in hand, and it is vain to attempt to weaken the similitude, by the fact that Heape had received the negroes for himself and sister. It is not reported, that he expressly so received them ; but if he had, it would have added no strength to his sister’s claim, either as to her right of property or her right of possession. Her rights would have been equally as perfect, though he had received them as an adverse claimant. Besides, as I have shewn in my preliminary remarks, the parallel holds good even in regard to the deliveryfor the original delivery to, and possession of, Mrs. Glover, under,the will of Peter Sinkler, operated equally for the benefit of all the remain-dermen, as for the life tenant, and could not afterwards be repudiated or qualified by the acts or claims of any of the parties in interest.
In Snowden v. Logan, there was an authoritative recognition of the principle. The case, as bearing on this question, is as follows. George J. Logan had married the widow of William J. Snowden, who died intestate, leaving his widow and an only child, who was the complainant in the cause. Mrs. Logan, on her first marriage, with Snowden, had received some negroes and furniture from her father, William Pope. On the death of Snowden, Mr. Pope had reclaimed the possession of the negroes, and held them until his daughter’s intermarriage with Logan. On this event, Mr. Pope, (according to his widow’s testimony) delivered the same negroes to Major Logan, as property which he had given to Mr. Snowden. Logan claimed the negroes in his own right, and the basis of his claim was, the assumed fact, that Mr. Pope had not given the negroes to his daughter in Snowden’s life, and had not parted with his right until they were delivered to him. But upon Mrs. Pope’s and other corroborative testimony, the Court decided that the negroes were of the estate of William J. Snowden. Logan also pleaded the statute of limitations against his step-daughter’s claim.
*480 But the Court decided that, although the long possession of seventeen yeats might bar an action on the part of Snow-J den’s administrator, it would not bar that of a co-distributee. The Chancellor then proceeds to remark — “a ground has, however, been taken in argument, which was not made on the Circuit, nor embraced in those set down for argument. It was, that Mrs. Logan’s administrator was a necessary-party to the partition sought and decreed, Mrs. Logan being entitled, according to the bill, to one-third of the property to be partitioned.” “ But it is,” says Chancellor Johnston, “ the opinion of my brethren, that if the point was properly made now, it falls within the principle of Burgess v. Heape, and that Major Logan’s marital rights attached to his wife’s share in his hands.” Thus, the principle was authoritatively recognized and enforced in this case ; for although the point was not properly before the Court as a ground of appeal, if •the Court had not held that the marital rights of Logan had attached, it might, and probably would, in conformity with its practice, have suspended its decree and_prdered the proper parties to be made.
In the case of Pickett v. Barber, we have the following language of Chancellor Harper. “If,” says he, “there was a legacy to two, and the executor had assented to and delivered the legacy to one of the two legatees for himself and the other, here the possession of one would be the possession of both, and the marital rights would attach.”
Then comes the case of Verdier v. Verdier, in whtch the same point was ruled. On the question whether the marital rights had attached, the Chancellor states the proposition in this form. “ After the written acknowledgment of all the parties, on the 28th December, 1837, the Court is bound to conclude that, on that day, the negroes in lots No. 1 and No. 3, in the division, both of the negroes of Mrs. Powell and Mr. Jenkins, were assigned and delivered by Mr. Gervais, either to his son and daughter, respectively, or to his son, Dr. Gervais, for himself and his sister, the present complainant. If, in severalty, it is decided by Sausey v. Gardner, that the marital rights attached. But if they were held in common by Dr. Gervais, then the authority of Pickett v. Barber is no less decisive.” In the latter case, the language of the Court is to this effect. “ If there were a joint legacy to two, and the Executor deliver the subject of it to one, for himself and co-legatee, here, the possession of one, would be the possession of both, and the marital rights would attach.” The case of Verdier v. Verdier was an appeal unanimously affirmed, without question or cavil.
The case of Hill v. Hill is strongly in point. In this case, John P. Bond, by a deed, gave first, certain negroes, by *481 name, to his soil, Felix; secondly;, certain other negroes, by name, to his daughter, Lucinda; thirdly, certain other ed negroes, to his son, Moses; and, fourthly, certain other named negroes, to his son, Theodore; with a valid limitation, in case any of them should die Avithout issue, to the survivors. Moses, Theodore and Felix, all died in the order in which I have named them, unmarried, without issue, and intestate. Lucinda, who had married the complainant, Jonathan M. Hill, was the sole survivor of the persons named in the deed, and was held by the Court as entitled to the property by survivorship, according to the terms of the deed, except such portions as had fallen to Theodore and Felix, by their own previous survivorship. The estates of the deceased were sold by their respective administrators, and at the sale, Jonathan M. Hill became a purchaser, and gave his bonds; and on the application that his interest, in right of his wife by survivorship, should be set off against his bonds given for his purchases at the sales, the question whether the marital rights had attached, came up for the judgment of the Court. I have said that the case was strongly in point. Let it be borne in mind, that Lucinda was not entitled to the whole of the property conveyed in the deed of John P. Bond. For the decision was, that so much thereof as had come to Theodore and Felix, as survivors of Moses, and so much thereof as had come to Felix as the survivor of Theodore, constituted, respectively, a part of their own absolute estates. So that Lucinda was a tenant in common with others ; she deriving title by survivorship, under the deed of John P. Bond, and they, by the rights of personal succession to the estates of her deceased brothers. There was no pre-tence of any possession by the husband, and the property had been sold by the administrators, and the proceeds were in their hands, subject to the order of Court.
The decision of the Court on the case thus made was, that the marital rights did attach upon the property that came to Lucinda Hill, by survivorship, under the deed, although it was not separated from that portion of the deeded property that was held to be the intestate estate of her deceased brothers. The language of that profound and illustrious jurist, my immediate predecessor, in delivering the judgment of the Court, is as follows. “ I say that the legal estate vested in Lucinda, and I am of opinion that the marital rights of her husband attached upon the property, so as to vest the legal title in him absolutely. The well known rule of the Court is, that the possession of one joint tenant is the possession of the Avhole, and this constitutes such a reduction into possession, as that the marital rights of the husband of a feme joint tenant will attach, though he has none of the property in his actual possession. Such are the cases of the *482 Ordinary v. Geiger and Burgess v. Heape. The rule is weq known, that if there be a perfect legal title, and the right of possession, that is enough to vest the property jn the husband, though there be no manual possession. And the husband may sue alone for the property, being thus vested with the perfect title. There can be no question, in the present case, with respect to the slaves taken originally by Felix. But there is as little doubt as to the other slaves which he held in common.” A case can scarcely be more strictly in point, nor language more emphatic and explicit.
In Heath v. Heath, the court say, peruO’Neall, J. “ There is no doubt, that when the wife has a perfect legal estate in goods and chattels, whether it be in severalty, joint tenancy, coparcenary or in common, it will vest in the husband jure mariti.” This, it may be urged, rvas but a dictum, but it was one which emanated from high authority, and was well sustained by a long and strong current of very decisive authorities. And considering it in the light of a dictum, it may be fairly set off pro tanto against the dicta in Sausey v. Gardner, and Younge v. Moore, if dicta they can be called, against the doctrine for which I am contending. In both of those cases the legal estate was in the wife, in seve-ralty, though not reduced to the possession of the husband during the continuance of the marriage relation. It was ruled (properly of course) that the marital rights had attached. In both cases, the court uses precisely the same language which I quote. “ When the wife has a legal estate in chattels personal, and the right of immediate possession in seve-ralty, the marital rights of the husband will attach, and vest the property in him.” The proposition, as thus stated, is undeniably true. It avers the precise circumstances of those two cases, in each of which the estate of the wife upon which the marital rights had attached, was in severalty. There is no negative, however, of the principles, that in a case of joint tenancy, or tenancy in common, under the like circumstances, the same results would follow. But if, by the introduction of the word “severalty,” in the proposition, a negative pregnant is intended, and it is meant to exclude the idea, that where the wife has a clear legal title to chattels personal, in joint tenancy or tenancy in common, and a right to the immediate possession, the marital rights will not attach ; then I say, that the court travelled out of the record, to express opinions on points not before it, and the decisions are not authoritative. They should not be considered as having any weight in undermining and. overthrowing a rule of property so long established in the country. It may be as well to remark, that the cases of Heath v. Heath and Sausey v. Gardner occurred about the same time, and the opinion in both eases was delivered by the same Judge, (O’N.) *483 and I can scarcely suppose that the more restricted form of expression in the latter case, was really intended to narrow, the principle as laid down in the former, more particularly as Heath v. Heath was the latest case.
But how is the principle ruled in the Ordinary v.. Geiger assailed Í The cases of Sausey v. Gardner and Young v. Moore, which I have just disposed of, are brought to bear against it. Then we are carried back to Byrne v. Stewart, Bunch v. Hurst, Elms v. Hughes and Speights v. Holloway,& for the purpose of shewing that partition was necessary cases of joint estates, to the vesting of the marital rights. If these cases were found to be in conflict with the Ordinary v. Geiger, I should think that the numerous decisions that have been subsequently made on the authority of the latter case, and the many titles that have vested under it, are sufficient, at this day, to give it an impregnable stability. But those cases are not in the slightest degree inconsistent with the Ordinary v. Geiger. I subscribe most cordially to the doctrine which they assert. They were all cases where there were legacies to the wife in the hands of the executor, or causes arising in reference to the distributive share of the wife in intestate estates. They were consequently cases where the question arose in regard to the equitable estate the wife, and not her legal estate, and where she had a present right of possession. The court very properly held, that partition was necessary to the vesting of the marital rights, in such cases as those last cited.
Then we are confronted with the case of Hood v. Archer. I see nothing to disapprove of in that case, and do not consider it as militating against my position. That was the case of a partition of real estate, in which the wife had a distributive share, and it arose in a court of law, under the Act of 1791. The . land was sold on a credit, and was paid in to the sheriff when the wife died. The surviving husband applied to the court for an order, that the whole of his wife’s share should be paid to him. This the court refused, on the ground that his marital rights had not attached. And they clearly had not; It was not a personal chattel, and was at best but a chose in action not reduced to possession, and which would have survived to the wife.
Thus I have, taken a hasly glance at all the cases bearing upon this question, which I have been able to find, and from 1805 to the present time, I find none in which the principle settled in the Ordinary v. Geiger has been seriously questioned or doubted, though there are many cases in which it has been broadly asserted in the form of abstract opinions, and others in which it has been rigorously and practically enforced against parties before the court. And there are cases where, in equity, it has been held to prevail in favor of the husband, against the equity of the wife for a settlement.
*484 And why, I emphatically ask, and for what end or purpose, shall we, at this late day, reverse the decision of the Ordinary v. Geiger, at the expense of much mischief and much future litigation, as I have endeavored to show ? Shall it be for the purpose of .going back to the principles of the common law, from which we have departed, and conforming our decisions more perfectly with those of the English Courts? This, with me, could be no adequate motive, even, if it could be demonstratively shewn, that our own decisions on this question have been at variance with the principles of the common law. It has been in operation long enough with us to have become the common law of South Carolina. Surely, we are entitled to have a common law of our own. Our country has become great and matured, and our bench is able and learned enough to be released from the leading-strings of the English Judges. We have departed from the common law in numerous instances, and why not in this, if it be indeed a departure ? After this, what lapse of time will be deemed necessary to give permanency and stability to a principle -of law depending upon the decisions of our Courts ? — . From the manner in which the Ordinary v. Geiger was. decided, I have inferred that the principle must have existed and been recognized long prior to that'day. But if otherwise, is not half a century long enough to sanctify a departure from the corpmon law ? Should we now feel ourselves called upon to disturb and violate all the rights and interests that have grown up, and the titles that have vested under this principle as a rule of property, from a fantastic desire to conform strictly.with the principles of the English common law, that are undergoing Protean transformations every day in.Westminster Hall?
But I do not admit that the decision in the Ordinary v. Geiger is at variance with the common law. I 'have heard nothing in the argument, and have seen nothing in my examinations of the subject, which inclines me to adopt that opinion. I deem this part of the case as of but little moment, but as far as my information extends, it seems, to me, that our decisions have been strictly in harmony with the principles of the common law. , The case of Blount v. Bestland, which was cited as seemingly contrary, is not in point. It was the case of a pecuniary legacy, which, though assented to by the executor, had not been reduced to possession.— It was at best but a chose in action, and not a personal chattel. The case naturally falls into a category with our case of Hood v. Archer. If it had been the bequest of a personal chattel, and the executor had assented, the legal estate would have passed to-the wife’and vested in the husband, and the rights would have attached. It could, in that case, have been classed with our case of Rhaine v. Davis, where *485 the possession of a guardian wits properly held to be such a possession as that the marital rights attached.
By our own decisions, none would doubt but that if a tel were delivered to an agent for a married woman, the marital rights would attach. But Bacon, in his Abridgement, says that “joint tenants and tenants in common are regarded as agents for each other.” This is a character which the law imposes upon them, and of which they cannot divest themselves. Whatever is delivered to one joint tenant, or what he takes possession of, in that character, he necessarily takes for his co-tenants as well as for himself.
Marriage, by the common law, confers a title upon the husband to all the wife’s goods in possession, and to which she has the right to the immediate possession, with a right to bring suit upon her choses in action. ' Bacon says, “ where the goods of a feme sole are in the possession of another by trover or bailment, and she marries, the property which continued in the wife is vested in the husband, and he alone, without the wife, may bring detinue for them.” See also 1 Chit. PI. 61, where it is said that in detinue the husband must sue alone without joining the wife, “ because the law transfers the property to him, and the wife has no interest.” The principle is thus laid down without the exception of cases of joint tenancies, <fcc. In trover, it is said the wife must join, because the conversion being before marriage, the right of action accrued to her. But I apprehend, that if the husband were to make a demand of the same chattel after marriage, he might maintain his action alone, upon the conversion as against himself.
Again, Chitty lays down the rule, that the actions of míe and trover may be maintained by any one who has the absolute or general property in the goods, with the right to the immediate possession. And now, I would ask, where one makes a gift to a feme covert in joint tenancy, or in common with another, without actual possession, but conferring the title with immediate right of possession, in whom do the rights of the wife vest ? The whole right arid title has gone .out oí the donor. It cannot be denied but that they have vested in the wife to fully as great an extent as they' have in her co-tenant, and whatever has vested in the wife, has ipso facto vested in the husband. And as a matter of course, the marital rights would attach.
In the case of Langham v. Nenory, the Master of Rolls, (Sir Richard Arden,) says, “ by marriage, the husband clearly acquires an absolute property in all the personal estate of his wife capable of immediate and tangible possession.” Is not her estate in common, if a chattel, capable of immediate and tangible possession? He can make manu-caption of the chattel wherever he may find it. If he were *486 to take it from the possessiof! of .his co-tenant, it would be no trespass. He may bring an action at law without joining his J wife. And as Chancellor Harper said, in Hill v. Hill, he may go even into equity for its recovery without making his wife a party.
My conclusion is, without pursuing this research further in the English authorities, that the decision in the Ordinary v. Geiger is in perfect harmony with the principles of the common law; and if it was now a new question, my judgment would be in favor of the rule therein adjudged.
IIichaRDsoN, J. and Dunkin, C. concurred.